IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

WILLIAM NILE ELAM, III,
Plaintiff,

v.

STEPHEN TIMOTHY EARLY, *et al.*
Defendants.

No. 1:23-cv-229 (MSN/WEF)

## MEMORANDUM OPINION

Stephen T. Early Sr., the country's longest-serving Press Secretary, worked for President Franklin D. Roosevelt from 1933 to 1945. In 1943, Norman Rockwell, an iconic American artist most famous for the cover illustrations he created for The Saturday Evening Post, spent a week at the White House observing and capturing scenes outside the Oval Office. Rockwell ultimately drew four illustrations depicting a collection of individuals—members of Congress, a beauty pageant winner, military officers—waiting for the opportunity to meet with President Roosevelt. Rockwell gave these illustrations, collectively known as and titled "So You Want to See the President?" (the "Illustrations"), to Stephen T. Early Sr. as a gift in October 1943, and they were published in The Saturday Evening Post on November 13, 1943.

Now, almost exactly eighty years later, the descendants of Stephen T. Early Sr. ask this Court to determine ownership of these Illustrations. Plaintiff William Nile Elam, a grandson of Stephen T. Early Sr., seeks a judgment declaring him the sole owner of the Illustrations. Defendants Michael S. Early and Stephen T. Early, also grandsons of Stephen T. Early Sr. and Plaintiff's first cousins, as well as Defendant Suzanne Early, daughter-in-law to Stephen T. Early Sr. and Plaintiff's aunt by marriage, each claim partial ownership of the Illustrations.

1

F. Scott Fitzgerald once opined, "family quarrels are bitter things. They don't go according to any rules." F. Scott Fitzgerald, *Babylon Revisited*, The Saturday Evening Post, Feb. 21, 1931. The (property) rules here, however, lead to a clear outcome: Plaintiff has satisfied his burden to establish sole ownership of the Illustrations. Accordingly, the Court will grant Plaintiff's motion for summary judgment and deny Defendants' motion for summary judgment.

## I.    BACKGROUND[1]

A discussion of this case requires an understanding of the Early family tree. Stephen T. Early Sr. ("Grandfather Early") married Helen Wrenn Early ("Grandmother Early"), with whom he had three children (the "Early children"). [Dkt. No. 40 (Joint Statement of Facts) ("JSOF") ¶ 3].[2] All three Early children are now deceased.

On October 16, 1943, Norman Rockwell gifted the original Illustrations to Grandfather Early, who took them to the home he shared with Grandmother Early on Morningside Drive in Washington, D.C. ("Morningside Drive Residence") [Dkt. No. 61 (Defendants' Statement of Facts) ("DSOF") ¶ 5]. The framed Illustrations, which are each approximately four feet by three feet in size, are reproduced below.[3] [Dkt. No. 64 (Plaintiff's Statement of Facts) ("PSOF") ¶ 11].

---

[1] The following facts are undisputed unless otherwise indicated.

[2] Attached to this Memorandum Opinion is Appendix A, which reproduces the Early Family Tree that appears in Defendants' memorandum of law in support of their motion to dismiss. [Dkt. No. 61 at 6].

[3] The Illustrations are also attached to Defendants' Counterclaim as Exhibit A.



### A.    The Early Family's Wills and Estates

The Court begins with a recitation of the facts surrounding the estate distributions of the

relevant members of the Early family. Grandfather Early died intestate in 1951. JSOF ¶ 2. He was

survived by his wife and the three Early children: Stephen T. Early Jr., Helen Early Elam, and

Thomas A. Early. *Id.* ¶ 3. The official accounting of Grandfather Early's assets, titled Appraisement and First and Final Account, which was filed with the Court in the District of Columbia, did *not* include the Illustrations. PSOF ¶ 3; *see also* PEX[4] 2, 3. Grandmother Early stated under oath that: (1) the appraisement, which included assets worth as little as $1.50, was "a true and perfect Inventory of the Goods, Chattels, and Personal Estate of [Grandfather Early]" at the time of its making on January 24, 1952, (2) any assets that later came into her "hands or possession" would be included in a subsequent "additional inventory," and (3) she knew of "no concealment of any part of [Grandfather Early's] estate by any person whatsoever . . . ." PEX 2 at 2, 5; PEX 5. It is undisputed that, at the time of and immediately following Grandfather Early's death, the Illustrations were located in Grandmother Early's Morningside Drive Residence. PSOF ¶ 1; DSOF ¶ 5.

Grandmother Early died on July 18, 1978. JSOF ¶ 4. She died with a will and codicil, neither of which referenced the Illustrations. PEX 7, 8. The accounting of the assets of Grandmother Early's estate—which was signed by the co-executors, Grandmother Early's eldest son, Stephen T. Early Jr., and her lawyer—did not list the Illustrations or any partial interest in them. PSOF ¶¶ 5, 6; PEX 6. To wind up the administration of Grandmother Early's estate, all three Early children executed acknowledgments stating that each had received a one-third share in "personal effects and household furnishings" in "full settlement of [their] share of the estate of" Grandmother Early. PSOF ¶ 7. Neither the Illustrations nor any partial interest in them are included. *Id.* Grandmother Early's will did make reference to unspecified "objects of art," to be left in equal shares to her three children. *Id.* ¶ 8. However, the inventory of her estate valued her

---

[4] Plaintiff's exhibits to his brief in support of his motion for summary judgment [Dkt. No. 64] are hereinafter referred to as "PEX," and Defendants' exhibits to their memorandum in support of their motion for summary judgment are hereinafter referred to as "DEX." [Dkt. No. 61].

household furniture and personal effects (which would include unspecified "objects of art") at $3,000, whereas an appraisal from 1979 valued the Illustrations at $80,000. *Id.*

As noted above, all three Early children are now deceased: Stephen T. Early Jr. died on June 27, 2009; Helen Early Elam died on November 9, 2009; and Thomas A. Early died on May 23, 2020. JSOF ¶¶ 6, 9, 11. Of the three children, only Helen Early Elam's will referenced the Illustrations. Neither Stephen T. Early Jr.'s will nor the inventory of his assets referenced an interest in the Illustrations. PSOF ¶ 9. Likewise, neither Thomas A. Early's inventory of assets upon his death nor his divorce proceedings identified any interest in the Illustrations. *Id.* ¶ 10.

Although Plaintiff alleges that his mother gifted him the Illustrations in 1999, Helen Early Elam's will, made in 1990, left the Illustrations to Plaintiff and his sister, Dru Anne Elam, in equal shares. *Id.* ¶ 18. Plaintiff and his sister—who is not a party in this action—entered into a contract in 2010 in which she acknowledged that their mother had given Plaintiff the Illustrations before her death, disclaimed any ownership right to the Illustrations, and transferred whatever rights she had to Plaintiff. *Id.* ¶ 20.[5]

On December 5, 2022, Plaintiff obtained a default judgment against Thomas A. Early II (brother to Defendants Stephen T. Early and Michael S. Early) in an action brought by Plaintiff against Stephen T. Early and Thomas A. Early II in the Circuit Court for Fairfax County, Virginia.[6] JSOF ¶¶ 13, 14. As a result of that default, Thomas A. Early II was adjudged to have no rightful claim to the Illustrations. *Id.* ¶ 14.

---

[5] Defendants vigorously contest that Plaintiff's mother gifted him with the Illustrations in 1999 and argue that he failed to allege this fact in the original lawsuit to resolve ownership of the Illustrations filed in Fairfax County Circuit Court in 2022. The Court does not have to resolve this issue, however, because it is not relevant to the disposition of this matter given that the contract with Plaintiff's sister transfers her interest to Plaintiff. Defendants do not, and cannot, have standing to assert any claims on behalf of Dru Anne Elam in this matter.

[6] *Elam v. Early, et al.*, Case No. CL 2022-7163.

### B.      The Illustrations' Location Over the Years

Having examined the record evidence regarding the Early family's estate distributions, the Court next endeavors to track the location and movement of the Illustrations over the past eighty years. The parties agree that from 1943 until 1951, the Illustrations were located at the Morningside Drive Residence of Grandfather and Grandmother Early. PSOF ¶ 1; DSOF ¶ 5. In 1949, Grandfather Early's daughter, Helen Early Elam (Plaintiff's mother), graduated from the Pratt Institute in Brooklyn, New York, and moved to St. Louis. DSOF ¶ 13. Plaintiff asserts, and Defendants contest, that the Illustrations were gifted to Helen Early Elam in 1949 by her father. Regardless of whether such a gift was made, the parties agree that Helen Early Elam was not in physical possession of the Illustrations in 1949 (and for at least the next decade). PSOF ¶ 11; DSOF ¶¶ 15, 19.

On August 11, 1951, Grandfather Early died intestate. JSOF ¶ 2. The location of the Illustrations from Grandfather Early's death in 1951 until 1960 is also not in dispute: they remained in the Morningside Drive Residence until 1956, when Grandmother Early moved to a residence on Tulane Drive in Alexandria, Virginia ("Tulane Drive Residence"). *Id.* ¶ 18. The Illustrations were located in the Tulane Drive Residence from 1956 until at least 1960. Here, the parties' accounts of the Illustrations' whereabouts diverge.[7]

Plaintiff alleges that his mother first took physical possession of the Illustrations in 1960, the year that she and her husband moved into a house—on Marlan Drive in Alexandria, Virginia ("Marlan Drive Residence")—that was finally large enough to display the Illustrations. PSOF ¶ 11. In a May 1990 letter to the Rockwell Museum, Helen Early Elam stated: "In 1960, I was given a set of original art works done by Norman Rockwell for the Saturday Evening Post Magazine . . .

---

[7] As explained below, that the parties' accounts diverge here does not preclude summary judgment because even accepting Defendants' version of undisputed facts, the Court must nevertheless find in favor of Plaintiff.

entitled 'So You Want to See the President.'" DSOF ¶ 21; DEX A at 34–35. Plaintiff alleges that the Illustrations were located at his mother's Marlan Drive Residence from 1960 until 1969, and remained with her from 1969—when she moved into Grandmother Early's then-residence on Hoover Lane ("Hoover Lane Residence")—until 1978. PSOF ¶¶ 12–13. Plaintiff thus maintains that Helen Early Elam had physical possession of the Illustrations continuously from 1960 until 1978. *Id.*

Defendants dispute that Helen Early Elam took possession of the Illustrations in 1960; however, they never expressly state *where* the Illustrations were housed from 1960 to 1969. Defendants instead allege that in 1969, Helen Early Elam took possession of the Illustrations "only for a short period of time," after "notic[ing] that her mother's residence had moisture issues and the artwork was in risk of damage. Thomas [A. Early] and Stephen [T.] Early [Jr.] brought the artwork to Helen [Early] Elam's residence to be stored until the problem was fixed." [Dkt. No. 67 (Defs.' Opp. to Pl. Mot. for Summ. J.) ("Defs. Opp.") at 11 (citing deposition testimony of Michael S. Early)]. The parties agree that sometime later that year, Helen Early Elam moved from her Marlan Drive Residence to Grandmother Early's Hoover Lane Residence and brought the Illustrations with her. *Id.*; PSOF ¶ 12.

The location of the Illustrations from 1969 until 2022 is not in dispute. In 1972, Grandmother Early suffered a stroke and thereafter resided in assisted living. *See* PSOF ¶ 12; Defs. Opp. at 9 n.9. Grandmother Early died on July 18, 1978. JSOF ¶ 4. The Illustrations remained at the Hoover Lane Residence—with Helen Early Elam—until July 31, 1978, when Plaintiff transported the Illustrations to the White House to be placed on loan on behalf of his mother. DSOF ¶ 38; PSOF ¶¶ 12, 13; DEX N at 7. They remained on loan to the White House until 2022. DSOF ¶ 39; PSOF ¶ 16. Although the lender of the Illustrations was initially listed as "Anonymous

Lender," Plaintiff subsequently obtained a written contract with the White House that governed the loan and reflected that the Illustrations were to be returned to Plaintiff upon his request. PSOF ¶ 13; Defs. Opp. at 11.

In 2017, Thomas A. Early claimed that he saw the Illustrations in the background of a recent televised interview at the White House. PSOF ¶ 15. Thomas A. Early's daughter-in-law, Apryll Early, contacted the curator of the White House in 2017, asserting her father-in-law's ownership interest in the Illustrations and noting that the loan to the White House had been made without his permission. *Id.* ¶ 15. Thomas A. Early wrote a letter to the White House curator dated February 27, 2017, in which he stated that he was a one-third owner of the Illustrations. *Id.* ¶ 15; Defs. Opp. at 12; DEX N at 5. The White House returned the Illustrations to Plaintiff in early 2022, DEX L ¶ 1, and the parties agreed that the location of the Illustrations after their departure from the White House could not be used as evidence to demonstrate ownership, *id.* ¶ 3.

## II.    PROCEDURAL HISTORY AND CLAIMS

Plaintiff filed a complaint on February 21, 2023 [Dkt. No. 1], and an amended complaint the following day [Dkt. No. 5 ("FAC")]. Plaintiff claims that he is the sole owner of the Illustrations. He alleges that Grandfather Early gifted the Illustrations to his mother, Helen Early Elam, in 1949 upon her graduation from the Pratt Institute in Brooklyn, New York, and that his mother then gifted him the Illustrations in 1999. FAC ¶¶ 10, 11. Plaintiff seeks (1) a judgment quieting title to the Illustrations in his favor as the sole owner of the Illustrations, and (2) a declaratory judgment that he is the sole owner of the Illustrations and that Defendants have no ownership interest in the Illustrations. FAC ¶¶ 30–34.

On March 13, 2023, Defendants filed an Answer and Counterclaim [Dkt. No. 10 ("Countercl.")] in which they allege that Helen Early Elam was never gifted the Illustrations by

Grandfather Early. Rather, Defendants contend that the ownership interest in the Illustrations passed to Grandfather Early's heirs—his wife and three children—upon his death intestate. Under Defendants' theory, Plaintiff can only have a one-third interest in the Illustrations. They allege in their Counterclaim that Plaintiff "took the [Illustrations] to the White House to conceal his removal of the [Illustrations] from his grandmother's house and to hide the [Illustrations] for a significant time period to 'launder' or 'wash' the ownership of [the Illustrations], in the effort to obtain sole ownership." Countercl. ¶ 15. Defendants bring counterclaims seeking to quiet title to the Illustrations and for a declaratory judgment that Defendant Suzanne J. Early is a one-third owner of the Illustrations and Defendants Stephen Timothy Early and Michael S. Early share a one-third ownership interest. *Id.* ¶¶ 66–70. In addition, Defendants' Counterclaim alleges conversion, detinue, breach of bailment, and civil conspiracy against Plaintiff.[8] *Id.* ¶¶ 33–52.

The parties have filed cross-motions for summary judgment. Defendants, in their opposition to Plaintiff's motion for summary judgment and at oral argument on the matter, have advanced a new theory in support of their claims for at least *one set* of Defendants. With respect to the heirs of Grandfather Early's younger son, Thomas A. Early (i.e., Defendants Stephen T. Early and Michael S. Early), the narrative remains consistent with the allegations in the Counterclaim—neither Thomas A. Early, nor his sons, Stephen T. Early and Michael S. Early, knew that the Illustrations had been loaned to the White House until 2017. But Defendants now offer a new theory as to Defendant Suzanne J. Early (the widow of Grandfather Early's older son, Stephen T. Early Jr.)[9]—in 1978, Plaintiff allegedly "sought the permission" of his uncle, Stephen

---

[8] Defendants have abandoned their claims for fraudulent concealment, fraud, and unjust enrichment. [Dkt. No. 67 at 25]; *see also* [Dkt. No. 87 at 56:2–14].

[9] Not to be confused with Stephen T. Early (without the Jr.), who is a grandson of Grandfather Early and a defendant in this action. Stephen T. Early Jr. is now deceased.  The heir to his estate—his wife, Suzanne Early—is also a defendant in this action.

T. Early Jr., to loan the Illustrations to the White House. Defs. Opp. at 18. Under this revised theory, Stephen T. Early Jr. *knew* the Illustrations were loaned to the White House when they were first transported in 1978.

The cross-motions are fully briefed, and the Court held oral argument on the matter on September 29, 2023. Accordingly, this matter is ripe for resolution.

## III.    STANDARD OF REVIEW

Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Carrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate where a party fails to make a showing sufficient to establish the existence of any essential element of the party's case on which that party has the burden of proof at trial. *Celotex*, 477 U.S. at 322–23. "[T]he burden of the moving party may be discharged by . . . pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. 2006), abrogated on other grounds by *Wilkins v. Gaddy*, 559 U.S. 34 (2010)). "The moving party . . . need not produce evidence, but simply can argue that there is an absence of evidence" by which the nonmovant can prevail at trial. *Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) (citations omitted).

If the movant has met that burden, the non-moving party must demonstrate that such an

issue of fact exists. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A party opposing . . . summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The non-movant may not rest upon a "mere scintilla" of evidence but must instead offer specific facts supporting its position. *Celotex*, 477 U.S. at 324. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247–48. Rather, to survive a summary judgment motion, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up). On cross-motions for summary judgment, the court "resolves all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion" when considering the individual motion. *Id.* (cleaned up).

## IV.    ANALYSIS

### A.    Quiet Title / Declaratory Relief

To determine ownership of the four Illustrations, the Court must first outline the relevant property law principles that govern resolution of this dispute. The common law provides that possession of property constitutes prima facie evidence of ownership until better title is proven. *State of Maine v. Adams*, 672 S.E.2d 862, 867 (Va. 2009). As the Fourth Circuit aptly put it: "Possession is nine-tenths of the law." *Willcox v. Stroup*, 467 F.3d 409, 412 (4th Cir. 2006) (cleaned up); *see also Adams*, 673 S.E.2d at 867 (discussing possession in the context of Virginia property law). The presumption makes sense, as individuals generally own the personal property that they possess. To rebut this presumption, Virginia law requires the "party not in possession of the disputed personal property [to] produce evidence of superior title." *Adams*, 673 S.E.2d at 867. If the non-possessing party "is able to produce evidence of superior title, the presumption of ownership in the possessor is defeated." *Id*. If, on the other hand, the non-possessing party fails to establish superior title to the property, "the presumption of ownership based on possession prevails and relieves a court from having to preside over a 'historical goose chase.'" *Id.* (quoting *Willcox*, 467 F.3d at 413).

Defendants urge the Court to use a different framework than the rebuttable presumption just described. They ask the Court to start *first* with D.C. intestacy law as it existed in 1951. Under D.C. law on *inter vivos* gifts, Defendants argue that Plaintiff cannot establish a valid *inter vivos* gift of the Illustrations to Helen Early Elam, and the Illustrations therefore passed down to Grandfather Early's heirs through the intestacy laws of D.C. at the time of his death. Defendants' reliance on the D.C. intestacy law as the starting point is misplaced; such analysis would require the Court to answer questions that are unanswerable at this stage, as all the witnesses with direct

knowledge of any such gift have been deceased for years (and in the case of Grandfather Early, for more than seven decades). As the Fourth Circuit explained in *Willcox*—a case involving disputed ownership of historic Civil War documents that "pose[d] questions" the appellate court was "ill equipped to answer"—the common law presumption of ownership from possession "recognizes and averts the possibility of a court's presiding over a historical goose chase." 467 F.3d at 413. For these reasons, courts must apply this common law framework in situations where, as here, "the events at issue are impossible to reconstruct." *Id.*

### 1. Presumption in Favor of Possessor

Having established the proper framework to resolve this dispute, the Court begins by determining possession of the Illustrations. As the Fourth Circuit has emphasized, "[t]hat possession is nine-tenths of the law is a truism hardly bearing repetition." *Willcox*, 467 F.3d at 412. As an initial matter, the parties have agreed that Plaintiff's possession of the Illustrations after being removed from the White House in 2022 cannot be used as evidence of ownership. The Court also notes at the outset that Plaintiff contends that either he or his mother have had "constructive" possession of the Illustrations at various times, specifically: (1) after they were allegedly gifted to Helen Early Elam in 1949 but prior to her taking physical possession of the Illustrations in 1960 [Dkt. No. 66 at 4]; and (2) from 1978 through 2022 when the Illustrations were housed in the White House [*id.* at 5–6]. Although Plaintiff identifies the distinction between actual and constructive possession, he cites no controlling caselaw—and the Court has not found any— suggesting that the common law presumption of ownership in favor of a possessor of personal property applies equally when one is in *constructive* possession (as opposed to *actual*—or physical—possession) of property. *Cf. Willcox*, 467 F.3d at 412 ("The common law has long

recognized that '*actual* possession is, prima facie, evidence of a legal title in the possessor.'") (citing William Blackstone, 2 *Commentaries* *196) (emphasis added).

Notwithstanding that Plaintiff's grandparents were in physical possession of the Illustrations from 1949 to 1960 and that they were on loan to the White House from 1978 to 2022, the Court finds that Plaintiff has advanced significant probative evidence that Helen Early Elam had physical possession of the Illustrations from 1960 until 1978, when the Illustrations were loaned to the White House—or, at a minimum, from 1972 until 1978. In May 1990, Helen Early Elam stated in a letter to the Rockwell Museum that "[i]n 1960, [she] was given a set of original art work done by Norman Rockwell for the Saturday Evening Post Magazine . . . So You Want to See the President." DSOF ¶ 21. This statement aligns with the facts in the record. In 1960, Helen Early Elam and her husband moved into the Marlan Drive Residence. PSOF ¶ 11. The record supports the assertion that the Illustrations were in the possession of Helen Early Elam, first in the Marlan Drive Residence from 1960 through 1969, and then in the Hoover Lane Residence from 1969 (the year that Helen Early Elam moved into the home) through 1978.[10]

Even if this Court were to ignore evidence of the Illustrations' location before 1972, the record is clear that after Grandmother Early was hospitalized in 1972 (and did not return to her home thereafter), and until the Illustrations were loaned to the White House in 1978, the Illustrations were housed in the Hoover Lane Residence where Helen Early Elam lived. Defendants' only point of contention with this fact is that the house belonged to Grandmother

---

[10] The only evidence offered by Defendants to rebut this narrative is the July 2023 testimony of Michael A. Early in response to a question about what was discussed at a 1969 meeting of Early family members. Michael (then a seven-year-old boy) testified that family members spoke about moving the Illustrations to Helen Early Elam's residence because of moisture issues in Grandmother Early's home. [Dkt. No. 67 at 11] (citing deposition testimony of Michael A. Early). To the extent this testimony is offered to establish the location of the Illustrations, the Court notes that the testimony is hearsay. "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).

Early; that does not change the fact that Helen Early Elam was, for at least six years, solely in possession of the Illustrations.

Defendants reject this narrative but offer little evidence to contradict it. They provide no admissible evidence as to the location of the Illustrations from 1960 through 1969. As discussed in footnote 10, Defendants' evidence is inadmissible hearsay. And even if it were not, this "mere scintilla" of evidence is insufficient to support Defendants' claim of ownership or oppose the record evidence on possession that Plaintiff has advanced. *See Celotex*, 477 U.S. at 324 (non-movant may not rest upon a "mere scintilla" of evidence but must instead offer specific facts supporting its position; "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"). Put simply, "the quality and quantity of the evidence offered" by Defendants "to create a question of fact" is inadequate to support their theory of possession. *See Thompson*, 57 F.3d at 1323.[11]

Rather, the combination of facts in the record paints a clear picture—either Plaintiff or his mother have had physical possession of the Illustrations from 1960 to 1978. Plaintiff is therefore entitled to the benefit of the common law presumption of ownership based on that possession.[12]

### 2. Evidence to Rebut Presumption

Having established that the presumption of possession favors Plaintiff, the burden shifts to Defendants to "produce evidence of superior title" in order to prevail on their claims of ownership. *Adams*, 672 S.E.2d at 867; *see also In re "Paysage Bords de Seine," 1879 Unsigned Oil Painting on Linen By Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 743 (E.D. Va. 2014) ("The burden lies

---

[11] Even if the Court were to accept this evidence, it does nothing to dispute Plaintiff's claim that Helen Early Elam physically possessed the Illustrations from 1972 to 1978.

[12] There is no dispute that the White House understood either Plaintiff or his mother to be the owner of the Illustrations from 1978 when it received the Illustrations until 2017 when Apryll Early contacted the White House to assert a claim of partial ownership on behalf of her father-in-law. The parties also do not dispute that all contracts entered into with the White House regarding the Illustrations were in Plaintiff's name.

with . . . the claimant out of possession, to rebut [the possessor's] presumptive proof of ownership
. . . ."). Although Defendants offer several theories to rebut the presumption, each fails for the
reasons set forth below.

Defendants' primary argument is that "the application of D.C. intestacy law and gift law
in this case rebuts and debunks any presumption of sole ownership by [Plaintiff]." Defs. Opp. at
7. They assert that the "undisputed evidence shows that there was never a valid *inter vivos* gift to
Plaintiff's mother under applicable law in D.C." *Id.* at 8. Defendants' argument rests completely
on the undisputed fact that there was no delivery of the Illustrations to Helen Early Elam until at
least 1960 and no evidence of dispossession of the Illustrations by Grandfather Early—elements
required to establish the Illustrations were given as *inter vivos* gifts under D.C. law. But
Defendants' burden to prove superior title—that is, to affirmatively "produce evidence of superior
title"—cannot be sustained by merely alleging that Plaintiff lacks evidence about the conversations
and intentions of Grandfather Early, who died more than seventy years ago. Pointing to an absence
of evidence on summary judgment can succeed only where such absence demonstrates that
Plaintiff cannot establish an essential element of his case, on which he will bear the burden of
proof at trial. *See Celotex*, 477 U.S. at 322. Here, Defendants cannot meet their burden to produce
evidence of superior title by pointing to the absence of record evidence proving an *inter vivos* gift.
This effort to rebut the presumption fails.

Defendants also attempt to rebut this presumption by advancing a theory of theft by
Plaintiff. Although "proof of theft would rebut [the possessor's] presumptive ownership," *see In
re Paysage*, 991 F. Supp. 2d at 744 (cleaned up), Defendants have offered no such proof. Examples
of evidence of theft sufficient to rebut presumptive ownership in other cases underscores the
inadequacy of Defendants' evidence here. For instance, in *In re Paysage*, the court was asked to

16

determine the ownership of a Renoir painting. 991 F. Supp. 2d at 744. The claimants there included (1) a woman who had purchased the painting from a flea market and therefore had possession of it immediately prior to the litigation, and (2) the Baltimore Museum of Art, which had reported the painting stolen while it was on display in an exhibition in 1951. *Id.* at 741–42. After finding that the flea market purchaser was entitled to the common law presumption in favor of possessors, the court ultimately concluded that the non-possessor museum produced compelling evidence to establish theft, including a police report, that was sufficient to rebut the presumption. *Id.* at 744. The police report was also corroborated by substantial contemporaneous evidence, including internal museum records, minutes from a board meeting referencing an insurance claim as a result of the theft, and a financial ledger confirming receipt of an insurance payment. *Id.* And *Brown University v. Tharpe*, No. 4:10-cv-167, 2013 WL 244652, at *1–*2 (E.D. Va. June 5, 2013), while decided following a bench trial, is also instructive. In *Brown*, the court concluded that Brown University presented sufficient evidence of theft of a Tiffany sword in its possession to prevail on its detinue action. There, the university presented evidence including a typewritten card identifying the sword as part of the memorial's holdings, evidence of the sword's location and storage prior to the disappearance, evidence that the sword's display case remained in the same place after its disappearance and that several other items in the vicinity were also missing, even though Brown had a policy prohibiting removal for any purpose other than repair and restoration.

Unlike in *In re Paysage* and *Brown*, Defendants have not provided the kind or quantity of evidence necessary to establish theft. As explained above, Defendants' argument turns largely on the assertion that there is *no* documented evidence Plaintiff has title to (or was gifted) the Illustrations, and therefore the Illustrations must have passed through the D.C. intestacy laws in force in 1951. The little evidence that is offered (to the extent it is even admissible, *see supra* at

14 n.10)—testimony that the Illustrations were housed in Grandmother Early's residence at some point prior to 1969—is not evidence of theft or even plausibly suggestive of theft.

Not only do Defendants fail to "produce evidence of superior title" as is required to rebut the presumption in favor of Plaintiff, but the evidence actually supports the conclusion that *Plaintiff* has superior title. Most notably, the history of the Early family members' estates is plainly inconsistent with Defendants' claim of superior title. The *only* one of the estates of Grandfather Early, Grandmother Early, and their three children (Stephen T. Early, Helen Early Elam, and Thomas A. Early) to specifically reference the Illustrations is that of Helen Early Elam.

The undisputed facts are telling. Grandfather Early died intestate, and the official accounting of his estate *did not include* the Illustrations—despite the fact that, as the Defendants themselves proffer, Grandfather and Grandmother Early had a "keen awareness of the importance of owning any piece by Norman Rockwell" and the Illustrations were their "most precious and prized possession."[13] These estate documents, which Grandmother Early signed under oath and which were deemed "a true and perfect Inventory of the Goods, Chattels, and Personal Estate" of Grandfather Early, included assets worth as little as $1.50. PEX 2. One can then only conclude that the Illustrations were not a part of Grandfather Early's estate because he had already gifted them during his lifetime. It is implausible that the Illustrations, which were approximately four feet by three feet in size when framed, were overlooked or forgotten entirely.[14] Helen Early Elam and Thomas A. Early each signed receipts acknowledging their distributions from the estate. PEX 4.[15]

---

[13] *See* [Dkt. No. 67-5 (letter from Thomas A. Early to William Allman, White House Office of the Curator, dated Feb. 27, 2017) at 6].

[14] *See id.* (noting that the Illustrations "were never some item that was lost and forgotten about").

[15] A receipt for Stephen T. Early Jr. was prepared but apparently not signed. PEX 4 at 1.

This conclusion is buttressed by the estates of Grandfather Early's heirs. Under Defendants' theory, all of Grandfather Early's heirs inherited partial ownership of the Illustrations. Yet *none* of their estates reference the Illustrations except for Helen Early Elam's. Indeed, had there been no gift to Helen Early Elam, Grandmother Early's estate should have reflected an interest in the Illustrations, but there is no mention of them. And each of Grandfather and Grandmother Early's children—Stephen T. Early Jr., Helen Early Elam, and Thomas A. Early— executed acknowledgments stating that each had received a one-third share in "personal effects and household furnishings" in "full settlement of [their] share of the estate of" Grandmother Early. PEX 6 at 4–6. The Court thus concludes that the Illustrations were not a part of Grandmother Early's estate upon her death and therefore there was no interest to pass on to her children.

Moreover, the Illustrations are not listed in the estates of either Stephen T. Early Jr. or Thomas A. Early—the persons through whom Defendants have allegedly inherited their interests. Nor were the Illustrations listed in Thomas A. Early's assets that were identified under oath as part of his divorce proceedings. PEX 14. The *only* member of the entire Early family to have listed the Illustrations in any estate document was Helen Early Elam. Her will, made in 1990, left the Illustrations to Plaintiff and his sister, Dru Anne, in equal shares. PEX 19. The Court need not settle the dispute as to *how* precisely the full ownership interest in the Illustrations was passed on to Plaintiff (whether by gift from his mother in 1999 or by contract with his sister) in order to conclude that Plaintiff—not Defendants—hold sole ownership of the Illustrations.

Defendants' only rebuttal is to hypothesize about the Illustrations' omissions from the estates of these family members: "heirs typically do not list in detail all personal property contained within the residence of a decedent; unfamiliarity with estate and estate tax law; a belief that since the Illustrations which contained a depiction of Grandfather Early were personal property or an

heirloom belonging to the Early/Elam families and need not be reported; and tax avoidance." [Dkt. No. 68 at 10]. But this is rank speculation; these far-flung theories are completely untethered to any evidence or any factual bases from which the Court can draw any legal conclusions.

Accordingly, the Court finds that Defendants have not met their burden to produce evidence of superior title sufficient to rebut the common law presumption in favor of Plaintiff. Indeed, the evidence leads to the inescapable conclusion that superior title lay with Plaintiff. The Court comes to this conclusion after drawing all reasonable inferences in Defendants' favor, and without weighing the admissible evidence or making any determinations of credibility, as is required at the summary judgment stage. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Here, there is no genuine dispute, based on the admissible evidence, as to the material facts that lead to this conclusion, including that from at least 1972 to 1978, the Illustrations were in Helen Early Elam's possession, and the only estate of any of the Early family members to reference the Illustrations was that of Helen Early Elam. Accordingly, Plaintiff is entitled to summary judgment on his quiet title and declaratory relief causes of action. The Court therefore grants Plaintiff's motion on these claims and denies Defendants' motion for summary judgment.

### B.      Common Law Claims

Resolving the parties' respective quiet title and declaratory judgment claims and counterclaims does not fully resolve this action because Defendants also raise several common law counterclaims—conversion, detinue, breach of bailment, and civil conspiracy—against Plaintiff.[16] Plaintiff has moved for summary judgment on these counterclaims, and for the reasons set forth below, the Court will grant Plaintiff's motion.

---

[16] As discussed above, Defendants have represented that they are abandoning their fraudulent concealment, fraud, and unjust enrichment counterclaims.

### 1.  Conversion

With respect to conversion, the Court finds that this claim is time-barred and that Defendants cannot establish conversion as a matter of law under these facts. Under Virginia law, a claim for conversion seeks to recover for the "wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession, [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956). For a conversion action to lie under Virginia law, a plaintiff must establish (1) the ownership or right to possession of the property at the time of the conversion, and (2) the defendant's conversion by the wrongful exercise of dominion or control over the plaintiff's property, depriving plaintiff of possession. *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 838 F. Supp. 2d 436, 440 (E.D. Va. 2012). The statute of limitations period for a conversion claim is five years. Va. Code § 8.01-243(B). Conversion accrues, and the limitation period begins to run, "from the date the injury is sustained in the case of . . . damage to property, . . . and not when the resulting damage is discovered." Va. Code § 8.01-230.

The conversion claim is time-barred based on Defendants' own allegations—as pled in the Counterclaim and as stated under oath in their responses to Plaintiff's Interrogatories—that Plaintiff transported the Illustrations to the White House "without the knowledge or consent of his Uncles Stephen T. Early, Jr. and Thomas A. Early." Countercl. ¶ 14; *see also* PEX 20 at 11. Defendants assert that the Illustrations were "loaned" to the White House in 1978 in an effort to conceal their location and with the goal of Plaintiff obtaining sole ownership. Because a claim of conversion does not accrue upon the date conversion is discovered, the conversion claim cannot have accrued in 2017 when Thomas A. Early discovered the location of the Illustrations or in 2021 when Plaintiff's attorney sent a letter asserting ownership. Rather, any conversion claim accrued

on the date of the injury (the allegedly wrongful taking of the Illustrations to the White House) in 1978—not the date of discovery (whether that was 2017 or 2021). The conversion claim, as pled in the Counterclaim, is therefore untimely.

As noted above, however, Defendants now advance a completely new theory, at least for one of the Defendants. This new theory was first set out in Defendants' opposition to Plaintiff's summary judgment motion, and articulated more fully at oral argument. With respect to the heirs of Thomas A. Early (Defendants Stephen T. Early and Michael S. Early), the narrative remains more or less the same—neither Thomas A. Early nor his sons, Stephen T. Early and Michael S. Early, knew that the Illustrations had been loaned to the White House until 2017. But Defendants have offered a new theory as to the widow of Stephen T. Early Jr., Defendant Suzanne J. Early. Plaintiff purportedly "sought the permission" of Stephen T. Early Jr. to loan the Illustrations to the White House. Defs. Opp. at 18. Under this theory, Stephen T. Early Jr. *knew* that the Illustrations were in the White House when they were first transported in 1978. Defendants argue that it was therefore not until 2021 when Stephen T. Early Jr.'s line of the family first became aware that Plaintiff asserted sole ownership of the Illustrations and thus—for the first time—he wrongfully exercised dominion or control over the Illustrations and deprived Stephen T. Early Jr. of possession to them (or in other words, performed an act amounting to conversion). The conversion claim, under this new theory, did not accrue until 2021 and is therefore not time-barred. Accepting the premise of this new theory as true, and setting aside that the new theory contradicts the allegations of the Counterclaim and Defendants' interrogatory responses made under oath, the Court finds that the conversion claim would nevertheless remain untimely. If there was an agreement between Stephen T. Early Jr. and Helen Early Elam to keep the Illustrations in the White House, the conversion claim would have accrued in 2009 when Helen Early Elam died. That is so because it

was upon her death that Plaintiff assumed control of the Illustrations exercising his right of ownership.[17] Having not filed a claim for conversion until nearly fifteen years later, any claim for conversion brought by Stephen T. Early Jr. or his widow Suzanne Early is time-barred regardless of whether the Court accepts Defendants' new theory.

Even if the conversion claim were timely, Defendants' conversion claim would still fail because they have not established that a conversion action can lie against a person (such as Plaintiff) who has a partial ownership interest in an indivisible object. Where the property that is the subject of a conversion claim is indivisible—such as an object of art—and where Defendants concede that Plaintiff has at least a partial interest in the property, Defendants have not established as a matter of law that they have "ownership . . . of the property" or the "right to possession of the property," as required under Virginia law. *See Gordon*, 838 F. Supp. 2d at 440. Nor have Defendants established that they were entitled to immediate possession of the Illustrations or that Plaintiff exercised "wrongful . . . dominion or control" over the Illustrations when Plaintiff was exercising dominion or control pursuant to his ownership interest. *Cf. Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 923 (E.D. Va. 2000) ("Only a party that has a property interest in and is entitled to the immediate possession of an item can bring an action for conversion.") (citing *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 718 (Va. 2000)). Accordingly, even if the conversion claim was not untimely, it would nevertheless fail as a matter of law because Defendants have

---

[17] Defendants state that "Plaintiff also spoke to Stephen, Jr. to discuss the loan to the White House," citing to Plaintiff's deposition testimony and the affidavit by Stephen T. Early Jr.'s son-in-law, which contains inadmissible hearsay. [Dkt. No. 67 at 22]. As discussed more fully below with respect to the breach of bailment claim, Plaintiff has not testified that *he* was ever a party to any agreement between his mother and Stephen T. Early Jr.

failed to make a showing sufficient to establish the existence of an essential element of the conversion claim.[18] *See Celotex*, 477 U.S. at 322–23.

>    *2. Detinue*

For similar reasons, Defendants cannot maintain their detinue cause of action against Plaintiff. A cause of action for detinue seeks the "recovery of specific personal property and damages for its detention." *MacPherson v. Green*, 87 S.E.2d 785, 789 (Va. 1955). A counter-plaintiff must establish (1) a property interest in the thing sought to be recovered, (2) the right to immediate possession of the property, (3) that the property is capable of identification, (4) that the property is of some value, and (5) that the counter-defendant had possession at some time before the institution of the action. *Vicars v. Atl. Disc. Co.*, 140 S.E.2d 667, 670 (Va. 1965). Defendants hypothesize, with no citation to supporting authority, that they are entitled to immediate possession by virtue of their alleged combined majority interest in the Illustrations. As with the conversion claim, citing to caselaw that merely states that a detinue action requires the plaintiff to have "*a* property interest" in the property is ineffective where the cited case does not involve a claim of partial ownership. *See* Defs. Opp. at 19 (citing *Brown v. Tharpe*, 2011 WL 2634164, at *2 (property at issue was a Tiffany sword and there was no claim of partial ownership interest in the sword). Defendants have failed to establish as a matter of law that they were entitled to immediate possession of the Illustrations—an essential element of a detinue action. Plaintiff is therefore entitled to summary judgment on the detinue claim.

---

[18] That some cases state that a party with "**a** property interest in an item" can bring an action for conversion is not helpful when those cases do not involve an owner's partial interest. *See* [Dkt. No. 27 at 18 (citing *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 923 (E.D. Va. 2000)].

### 3. *Breach of Bailment*

The Court must also grant Plaintiff summary judgment on Defendants' breach of bailment cause of action. A bailment is created when a chattel is lawfully delivered by or with the permission of its owner (the bailor) to a person (the bailee) who accepts possession of the chattel. *K–B Corporation v. Gallagher*, 237 S.E.2d 183, 185 (Va. 1977). "'[I]t is the element of lawful possession, however created, and duty to account for the thing as the property of another that gives rise to the bailment, regardless of whether such possession is based on contract in the ordinary sense.'" *Id*. (quoting *Crandall v. Woodard*, 143 S.E.2d 923, 927 (Va. 1965). A bailment is based on either an actual agreement or an agreement implied in law.

As Plaintiff points out, Defendants' bailment allegations have morphed over the course of this litigation. The initial premise of the bailment, as pled in the Counterclaim, was that Helen Early Elam's two brothers (Stephen T. Early Jr. and Thomas A. Early) entrusted Plaintiff and his mother with "the storage of [the Illustrations] until such time as the children of Grandparents Early and/or their lawful heirs agreed upon a mechanism to divide or otherwise handle the proportionate ownership interests they had in the artwork." Countercl. ¶ 45. The Counterclaim alleges that the transportation of the Illustrations to the White House was done to "hide" them in an effort to "launder" or "wash" their ownership, and that Plaintiff deliberately concealed from his uncles and their descendants the location of the Illustrations in the White House.[19] Under the terms of any bailment agreement, as alleged in the Counterclaim, the bailment was breached when the Illustrations were moved to the White House in 1978.[20] However, because the statute of limitations

---

[19] The Court notes that Plaintiff states in his affidavit that there was an attempted break-in at the Hoover Lane Residence in May 1978, which is what spurred his mother to seek a new (and safer) location for the Illustrations. PEX 1 ¶ 6; Ex. A to PEX 1 (response to police records request indicating that there was a reported incident of vandalism at the Hoover Lane Residence with damage of "[s]ide [d]oor [j]am" reported).

[20] The cause of action accrues when the contract is breached, not when the harm is discovered. Va. Code § 8.01-230.

for oral contracts and contracts implied at law is three years,[21] *see* Va. Code § 8.01–246(4), Defendants' breach of bailment claim, as it is pled in the Counterclaim, is thus time-barred.

The premise of any alleged bailment agreement, however, changed during discovery. Defendants stated under oath in their responses to interrogatories that the bailment agreement was between Stephen T. Early Jr., Thomas A. Early, and Plaintiff's mother. *See* PEX 20 at No. 1. Under this version of events, Plaintiff was never a party to the bailment agreement; there was therefore no written, oral, express, or implied agreement between Plaintiff and any of the Defendants. Defendants cannot maintain a breach of bailment agreement against Plaintiff under this theory either.

During summary judgment briefing and at oral argument, Defendants' theory in support of their breach of bailment cause of action once again changed. They now acknowledge that Stephen T. Early Jr. was informed that the Illustrations would be loaned to the White House, and have revised the circumstances of the oral bailment agreement—only as it concerns Stephen T. Early Jr. and the heir to his estate (Defendant Suzanne Early)—such that Plaintiff and his mother were to "take possession of the Illustrations with the sole and limited purpose of loaning them to the White House." Defs. Opp. at 22. The only evidence Defendants cite in their briefing to establish a bailment to this effect is the deposition testimony of Plaintiff and an affidavit submitted by Edward DeLeon, who is the husband of Suzanne Early's daughter. But neither the affidavit nor the deposition supports this argument. Plaintiff's cited testimony merely states that his mother called Stephen T. Early Jr. and told him that the White House curator was interested in a loan. DEX K at 86:6–10. Plaintiff's mother "asked [Stephen T. Early Jr.] what he thought, and he thought it was a good idea." DEX K at 86:6–10. The testimony does *not* state, as Defendants purport, that Plaintiff's

---

[21] Defendants stated in their response to Interrogatories that any bailment agreement was oral.

mother "contacted Stephen, Jr. (a one-third owner of the Illustrations) *to obtain his agreement* that the Illustrations would be placed on loan to the White House." Defs. Opp. at 22 (emphasis added). And, the testimony by Edward DeLeon about what Stephen T. Early Jr. allegedly told DeLeon is inadmissible hearsay and improper for the Court to consider. *See* Fed. R. Civ. P. 56(c)(4); *Md. Highways Contractors*, 933 F.2d at 1251. Without any admissible evidence in support of their claims, the Court finds that, even under the newest theory advanced by Defendants on the bailment issue, Defendants cannot establish a bailment agreement as a matter of law.

### 4. Civil Conspiracy

Because Defendants cannot maintain any of their substantive common law claims, they cannot maintain an action for civil conspiracy, which they allege is predicated on the conversion and breach of bailment claims. *See* Countercl. ¶ 51 (alleging that Plaintiff and his mother "agreed for a common purpose to commit the tortious acts of conversion [and] breach of bailment").[22] "[T]he statute of limitations 'for civil conspiracy is based on the statute of limitations for the underlying act.'" *Lokhova v. Halper*, 995 F.3d 134, 147–48 (4th Cir. 2021) (citing *Hurst v. State Farm Mut. Auto. Ins. Co.*, No. 7:05-cv-776776, 2007 WL 951692, at *5 (W.D. Va. Mar. 23, 2007)). Accordingly, the civil conspiracy claims are time-barred because the conversion claim and breach of bailment claim (as pled in the Counterclaim) are time-barred. And, Defendants cannot maintain an action for civil conspiracy when they cannot, as a matter of law, prove an essential element of conversion or breach of bailment, as explained above. *See Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007) ("[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed.").

---

[22] The civil conspiracy cause of action was also based on the fraud and fraudulent concealment claims, which Defendants have agreed to voluntarily dismiss.

Accordingly, the Court grants summary judgment to Plaintiff on Defendants' conversion, detinue, breach of bailment, and civil conspiracy counterclaims.

## V.      CONCLUSION

For the reasons stated above, the Court will deny Defendants' motion for summary judgment and grant Plaintiff's motion for summary judgment in an Order to be issued with this Memorandum Opinion.

/s/
_____
Michael S. Nachmanoff
United States District Judge

October 31, 2023
Alexandria, Virginia